# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:10-CR-109 |
| | ) | |
| SISTOL BERNAL, | ) | |
|     a/k/a "Cisco," | ) | |
|     a/k/a "Suge," | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on the Notice of Appeal of Magistrate Judge's July 12, 2010 Detention Order, filed by Defendant, Sistol Bernal, on July 26, 2010. The Court has reviewed the detention hearing held before Magistrate Judge Andrew P. Rodovich on July 7, 2010, all evidence submitted at the detention hearing, and the order of detention issued on July 12, 2010. After review, this Court concurs with the order of detention, and **DENIES** Defendant's request to post bond in this case.

BACKGROUND

Sistol Bernal ("Bernal") was arrested on June 29, 2010, pursuant to an indictment charging him with Conspiracy to Participate in Racketeering Activity, in violation of 18 U.S.C. Section 1962(d). More specifically, the indictment alleges that

Bernal is a member of the "Almighty LATIN KING and Queen Nation", a criminal organization whose members and associates engaged in acts of violence, including murder, attempted murder, assault with a dangerous weapon, and narcotics distribution. The indictment alleges numerous overt acts, the following of which reference Bernal: (1) on or about November 9, 2004, Bernal had a telephone conversation with a Latin King member discussing the Texas Latin King hierarchy and other topics relating to the enterprise; (2) on or about May 28, 2005, Bernal, Vargas, Zambrano, and another Latin King member traveled from the Chicago/Northwest Indiana area to Texas to meet with the Texas Latin King hierarchy; (3) on or about May 29, 2005, Bernal threatened the Texas Latin King leadership that they would be "smashed" if they did not comply with the rules issued by Latin King hierarchy from the Chicago area; (4) on or about May 29, 2005, Bernal designated the Texas Latin King state enforcer as the person to communicated between Texas and the Chicago Latin King hierarchy; (5) in or about October of 2005 Bernal possessed a large quantity of controlled substances; and (6) in or about October 2005, Bernal directed other associates to conduct a home invasion and robbery in Hammond, Indiana. If convicted, Bernal faces a maximum sentence of 20 years.

A detention hearing was held on July 7, 2010, before Magistrate Judge Andrew P. Rodovich. At that hearing, both the Government and Defendant had a full opportunity to produce evidence. Special Agent David Coulson testified on behalf of the Government. The Government introduced several clips from a longer

surveillance video, as well as several recorded telephone conversations and documents from Immigration Custom Enforcement verifying the international travels of Bernal. After hearing the evidence, Magistrate Judge Rodovich made the following findings of fact relevant to Bernal:

> 3. Beginning in September 2003, federal agents in Houston, Texas began an investigation into the activities of the Latin Kings street gang. The investigation included information obtained from confidential informants, surveillance, and wiretaps.
> 4. Federal agents learned that a high-level meeting was scheduled to occur at a community center in Texas. Prior to the meeting, the agents obtained a court order to install both audio and video surveillance.
> 5. On May 29, 2005, Vargas and Bernal attended the meeting which included members of the Latin Kings from Texas. Bernal was the primary spokesman at the meeting, but Vargas and others also made comments.
> 6. The Latin Kings have a national structure which is divided into regions across the United States. The government has alleged that Bernal is an officer in the Latin Kings national organization and that Vargas is in charge of the regional affiliate which operates on the southside of Chicago and northwest Indiana.
> 7. At the meeting, Bernal indicated that one of his enforcers, Jose Zambrano, accompanied him from Chicago.
> 8. As various individuals entered the meeting room, they were searched for recording devices. During the meeting, Bernal indicated that even his Incas, the second in command, were searched down to their shorts before any gang meetings. Bernal stated that this precaution was necessary to prevent any confidential informant from wearing a bodywire.
> 9. In bragging about his organization, Bernal indicated that Vargas has 400 "soldiers" who were recruited into the gang and trained.
> 10. During the meeting, Bernal also

indicated that he only dealt with his two Incas to insulated himself from any gang activities.

11.  After warning the other participants in the meeting that they were required to follow the dictates coming from Chicago, Bernal appointed an individual named Jose Nava to be the Texas contact with Chicago.  This appointment came after Bernal asked whether Nava could be trusted, and another individual vouched for Nava by stating that they had committed a murder together.

12.   Nava later was indicated and convicted of a double-murder in Texas.

13.  In the fall of 2006, the brother of Vargas was killed by members of the Latin Dragons, a rival street gand [sic], in a drive-by shooting.

14.  On February 22, 2007, Latin Dragons again opened fire on a meeting of the Latin Kings.

15.  On February 25, 2007, Latin Kings Jason Ortiz, Brandon Clay, and Jermaine Ellis killed two members of the Latin Dragons in retaliation for the killing of Vargas' brother.

16.  Shortly after the killings, Ortiz, Clay, and Ellis were arrested, and two murder weapons were recovered from their vehicle.

17.  One of the murder weapons was an AK47 which had been used two weeks earlier to kill a US Marine on leave from Iraq.

18.  After their arrests, both Ortiz and Clay gave statements indicating that the two murders were in retaliation for the death of Vargas' brother.

 19.  Although Ortiz, Clay, and Jermaine Ellis were not charged with murder, Ortiz received a nine month prison sentence for a parole violation.

20.  During his incarceration, Ortiz was recorded discussing the homicides with Clay.  Ortiz was concerned that Ellis may have cooperated with the police and indicated that he had obtained a "green light" to kill Ellis.  According to Agent Coulson, when Ortiz indicated that he has obtained the "green light" from the "old guys", he was referring to Vargas and Bernal.

* * *

>       22.   According to ICE documents, between
> 2005 and 2010 Bernal re-entered the United
> States thirty-eight times from Mexico.
>
> * * *
>
>       25.   Bernal owns a home and lives in
> Chicago. He has family members in the Chicago
> area.
>       26. According to the Bond Report, Bernal
> has worked for C&A Construction for four
> years.
>       27.   On January 29, 1988, Bernal was
> convicted of theft and placed on probation for
> one year.   On June 25, 1990 Bernal was
> convicted of possession of a controlled
> substance and intent to distribute and was
> sentenced to seventy-two months imprisonment.
> Bernal has not had any other convictions since
> that date.

(July 12, 2010 Order at 1-5).

Magistrate Judge Rodovich ordered that Bernal be held without bond, finding that he presented a danger to the community. The written order of detention issued by Magistrate Judge Rodovich provides, in part, the following:

> Bernal is an officer in the Latin Kings street
> gang on a national level, and Vargas is in
> charge of a regional chapter of the Latin
> Kings.  Both defendants traveled to Texas to
> participant [sic] in planning for a narcotics
> operation with Latin Kings based in Texas.
> Bernal was in charge of the meeting and
> informed the participants that they were
> required to follow the dictates coming from
> Chicago.  He also advised the other Latin
> Kings that he had brought his enforcer from
> Chicago and searched everyone who attended the
> meeting.  See generally United States v.
> Jemison, 237 F.3d 911, 918 (7th Cir. 2001)
> ("judges and the public are not blissfully
> ignorant of the connection between criminal
> violence and street gangs.).
>       The   Latin   Kings   have   a   national
> organization, and Vargas has recruited 400
> "soldiers" from his region.   This formal

> structure of the street gang would permit the defendants to intimidate potential witnesses or to relocate somewhere in the United States.
> After Vargas' bother was killed, three members of his regional organization killed two members of the rival Latin Dragons street gang. Two of the participants in the homicide, Ortiz and Clay, also discussed killing the third participant, Ellis, because they were concerned that Ellis may have cooperated with the police.
> Vargas has used fictitious names, dates of birth, and social security numbers. Bernal has no significant ties to the Northern District of Indiana.
> Under all of these circumstances, it is unlikely that the Probation Department could effectively monitor the defendants if released on bond.

(July 12, 2010 Order at 5-7). Bernal now seeks review of Magistrate Judge Rodovich's detention order. Bernal claims both that the Government failed to meet its burden and that the Magistrate Judge's findings are not supported by the evidence.

DISCUSSION

Section 3145(b) provides for district court review of a magistrate's release or detention order. Pursuant to this provision, the district court must conduct a *de novo* review and need not defer to the magistrate's findings. *United States v. Levine*, 770 F. Supp. 460 (N.D. Ind. 1991)(citations omitted); *United States v. Shaker*, 665 F. Supp. 698, 701 (N.D. Ind. 1987)(citations omitted).

The district court's review of a magistrate judge's detention order may be conducted either by reviewing the transcript, or by holding a new hearing. *United States v. Torres*, 929 F.2d 291, 292

(7th Cir. 1991). Although the district court has the *authority* to conduct a new hearing, it is not required. Bernal does not specifically request a new hearing. 18 U.S.C. section 3142(f) provides that detention hearings "may be reopened before or after a determination by the judicial officer...if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." Bernal has offered nothing that would satisfy this threshold requirement for re-opening the detention hearing. As such, this Court exercises its discretion to conduct its *de novo* review without hearing additional evidence or argument.

Under the Bail Reform Act of 1984, a defendant shall not be detained pre-trial unless a condition or combination of conditions will not reasonably assure (1) the defendant's appearance as required and (2) the safety of any other person and the community. 18 U.S.C. § 3142(e). The Government has the burden of proving that the defendant is either a flight risk or a danger to the community. *United States v. Daniels*, 772 F.2d 382, 383 (7th Cir. 1985). To justify detention based on the defendant's alleged dangerousness, the Government must establish "by clear and convincing evidence that no condition or set of conditions will ensure the safety of the community." *U.S. v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985). On the other hand, to justify detention based on a risk of flight,

it must be established by a preponderance of the evidence that no set of conditions will reasonably assure the defendant's appearance in court at the required times. *Id.* at 765. A finding of either danger to the community or a flight risk is sufficient to detain a defendant awaiting trial; a court need not find both to detain a defendant under the Act. *U.S. v. Daniels,* 772 F.2d at 383.

In determining whether the Government has carried its burden of proof, the court may consider several factors. 18 U.S.C. § 3142(g). The factors pertinent to this matter include:

> (1) the nature and circumstances of the offense charged ...;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including -
> > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct ... and record concerning appearance at court proceedings ...
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*Id.*

Based on a *de novo* review of the evidence presented and proffered before Magistrate Judge Rodovich, this Court adopts the findings annunciated by Magistrate Judge Rodovich, except as to his finding that Agent Coulson testified that Ortiz' reference to "old guys" was a reference to Vargas and Bernal. Agent Coulson in fact testified that he did not know. (Transcript of Detention Hearing, July 7, 2010, at 59, 72). Because that finding is not material to

-8-

the result, this Court finds by clear and convincing evidence that no condition or set of conditions will ensure the safety of the community.

Furthermore, this Court finds by a preponderance of the evidence that there is a serious risk that Bernal will not appear in court. Bernal is facing a considerably long sentence in this case, he has a history of significant travel to Mexico, and he is a high-ranking officer in a gang organization in which officers limit exposure to prosecution by limiting the number of contacts with other gang members. In this case, Bernal's significant family ties to the area, employment record, and his lack of a recent criminal record do little to persuade the Court that Bernal is likely to appear because Bernal is seen on video making clear distinctions between his gang activity and his familial activities. In the words of Attorney Cooley, "they insulate themselves from the dirty work ... they have layers of chain of command in which they will allow these people to execute the duties or the obligations of the Latin Kings, go on the missions if you will." (Transcript of Detention Hearing, July 7, 2010, at 83). These same layers of insulation that protected Bernal from prosecution for so long also suggests a ready avenue for escape in the face of prosecution.

CONCLUSION

In summary, the credible testimony and information submitted at the hearings before Magistrate Judge Rodovich establishes by clear and convincing evidence that the Defendant poses a danger to

the community and by a preponderance of the evidence that the Defendant will not appear.  Thus, the Court finds that the Government has carried its burden of showing by clear and convincing evidence that Bernal is a danger to the community and that no conditions or combination of conditions will protect the community. In addition, the Government has carried its burden of demonstrating by a preponderance of the evidence that Bernal is a risk of flight. Accordingly, this Court **ORDERS** that Bernal remain **HELD WITHOUT BOND.** Pursuant to 18 U.S.C. section 3142(i), it is **ORDERED** that:

- A. Defendant is committed to the custody of the Attorney General or his designated representative for confinement in a correctional facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.

- B. Defendant shall be afforded a reasonable opportunity for private consultation with his attorney; and

- C. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver Defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

**DATED: July 30, 2010**               /s/ RUDY LOZANO, Judge
                                        **United States District Court**